UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| BILLY SAM MULLINS, | : | CASE NO. 5:21-cr-00813 |
| | : | |
| Plaintiff, | : | OPINION & ORDER |
| | : | [Resolving Doc. 23] |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Defendant. | : | |
| | : | |

JAMES S. GWIN, UNITED STATES DISTRICT COURT JUDGE:

In this firearm case, Defendant Billy Sam Mullins moves to suppress evidence seized from his residence and statements he made.[1]  The Government opposes.[2]

For the following reasons, this Court **GRANTS** Defendant's motion to suppress.[3]

I.        Background

A. Jenny Holstein's Arrest.

On May 17, 2021, the Portage County Common Pleas Court issued an arrest warrant for Defendant Mullins' live-in girlfriend, Jenny Holstein.[4]  The warrant listed an address of 1428 Mahoning Road, Deerfield, Ohio 44411 ("the Residence").[5]  Holstein owned the Residence.[6]  Mullins had resided at the Residence for several months.

Law enforcement was investigating Mullins for methamphetamine distribution.[7]

---

[1] Doc. 23.
[2] Doc. 28.
[3] On January 19, 2022, the Court held a Zoom hearing on the motion to suppress.
[4] Doc. 28-3.
[5] *Id.*
[6] Tr. of Hr'g on Mot. to Suppress at 84 [hereinafter "Tr."].
[7] Doc. 28 at 1.

Case No. 5:21-cr-00813
GWIN, J.

Mullins, not Holstein, was the principal investigation target.[8]  But law enforcement had a

warrant for Holstein's arrest for conveying drugs to a minor.

Near 7:30 a.m. on May 18, 2021, officers from the United States Marshals Service's

Northern Ohio Violent Fugitive Task Force, the Portage County Sheriff's Office ("PCSO"),

and the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") arrived at the

Residence to execute the arrest warrant.[9]  The Residence is a small home that sits on a larger

property in a rural area with a 220-foot driveway leading to Mahoning Road.[10]

Six Fugitive Task Force officers in riot gear knocked on the Residence's back door and

announced their presence.[11]  Within one minute, Defendant Mullins exited the Residence.[12]

The officers had an arrest warrant for Jenny Holstein, not Mullins.  But when Mullins exited

the house, the officers handcuffed Defendant Mullins behind his back.[13]  At the same time,

Holstein exited the Residence and arresting officers also handcuffed her.[14]

Law enforcement officers then took Mullins and Holstein some distance down the

driveway towards Mahoning Road and away from the Residence.  The officers put Holstein

in a police car near the Mahoning Road driveway entrance and more than 200 feet from the

Residence.[15]  Although the officers had no arrest warrant for Mullins, they nonetheless

marched Mullins to the end of the driveway where he was detained with PCSO Detective

---

[8] The Complaint used to support Holstein's arrest does not appear to intelligible allege criminal conduct.  The Complaint alleges: "JENNY HOLSTEIN . . . 1428 MAHONING ROAD DEERFIELD, OHIO 44411 did knowingly by any means, induce or cause a juvenile, to wit: John Doe, who is at least two years said offender's junior, a controlled substance, to wit: methamphetamine, a scheduled I controlled substance, said offender knowing the age of said juvenile or being reckless in that regard, in the vicinity of a school . . . ."

[9] Docs. 23 at 2; 28 at 2.

[10] Tr. at 76 ("I was at about 90 – about almost say roughly about 90 yards down my driveway like, the driveway's really, really, really long.").

[11] Docs. 23 at 2; 28 at 2–3; Tr. at 9, 11–12.

[12] Tr. at 12

[13] *Id.*

[14] *Id.* at 13.

[15] Doc. 28 at 3; Tr. at 45, 62–63.

Case No. 5:21-cr-00813
GWIN, J.

Eric Centa and ATF Special Agent Elizabeth Gardner.[16]

### B. Protective Sweep of the Residence.

After Defendant Mullins and Holstein exited the house, the officers testified that they heard noise and detected "movement in the kitchen area."[17] The officers again announced their presence and, after receiving no response, entered the kitchen to investigate.[18] Mullins testified that he had been holding his dog in the kitchen when officers knocked on his door and before he exited the Residence.[19] Holstein occupied the hallway at the entrance to the kitchen when the officers knocked.[20]

Officers later acknowledged that the dog was the source of the noise.[21] The dog likely remained in the kitchen area after Mullins put the dog down and as Mullins and Holstein left the kitchen with the officers.

Instead of stopping in the kitchen, however, officers continued to search the house.

Task Force Officer Liggett left the kitchen and went down a long hallway into the master bedroom where he observed a silencer in "plain view" on a bookshelf.[22] Officers testified that the silencer sat on a higher shelf among a messy group of other items.[23]

Officer Liggett exited the house and told Detective Centa and Agent Gardner about the silencer.[24] Without a search warrant—and after it was clear there was no threat of danger inside the dwelling—the three officers then reentered the Residence to further examine the

---

[16] Doc. 28 at 3–4; Tr. at 45.
[17] Tr. at 13.
[18] *Id.* at 13–14.
[19] *Id.* at 75.
[20] *Id.* at 86.
[21] *Id.* at 14, 64.
[22] Tr. at 45–47, 54–55, 63.
[23] *Id.* at 55–57.
[24] *Id.* at 45–46, 63.

Case No. 5:21-cr-00813
GWIN, J.

silencer.[25]

### C. Defendant Mullins Waives his *Miranda* Rights.

The officers returned to the end of the driveway where Detective Centa read Mullins

his *Miranda* rights.[26]  Mullins waived his rights and spoke with the officers.[27]

### D. Defendant Mullins Consents to a Search of the Residence.

While at the end of the driveway, Mullins informed the officers he needed to urinate.[28]

Officers re-cuffed Mullins' hands in the front of his body so he could relieve himself outside.

During this time Mullins was also given access to cigarettes and soda.[29]

After the officers returned from viewing the silencer, they questioned Defendant

Mullins about his alleged methamphetamine distribution and firearms.[30]  Mullins asked what

he could do to help himself and offered to make controlled purchases.[31]  Mullins initially

denied owning any firearms but admitted there were firearms in the Residence belonging to

Holstein.[32]  After some additional back-and-forth, Mullins told officers he would take them

to "where everything is in the house."[33]

Defendant Mullins led officers through the Residence, pointing out the locations of

firearms and drugs.[34]  The officers asked Mullins about the silencer.[35]  Based on this

information, Detective Centa drafted a search warrant for the Residence.[36]  The Portage

County Court of Common Pleas approved the search warrant at around 2:00 p.m. and

---

[25] *Id.*
[26] Doc. 28 at 3–4; Tr. at 46, 76.
[27] *Id.*
[28] Docs. 23 at 2; 28 at 4; Tr. at 69–70, 78.
[29] Tr. at 22, 24, 70.
[30] *Id.* at 66.
[31] *Id.*
[32] *Id.* at 67.
[33] *Id.*
[34] Tr. at 68–69.
[35] *Id.* at 69.
[36] *Id.* at 49–50.

Case No. 5:21-cr-00813
GWIN, J.

officers executed the search immediately.[37]

## II.    Discussion

### A.  Officers' Exceeded the Scope of a Protective Sweep.

Law enforcement can conduct a protective sweep of areas immediately adjoining a person subject to arrest so long as the sweep "lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises."[38]  In situations involving arrests immediately outside a dwelling, officers may conduct a protective sweep if they have "an articulable basis" for reasonably believing that someone inside the home might pose a danger to those at the scene outside the home.[39]  Protective sweeps are "quick and limited."[40]  They are "not a full search of the premises" and may entail only a cursory inspection of spaces where a person may be found.[41]

The officers exceeded the bounds of a valid protective sweep in this case.

Law enforcement came to the Residence to arrest Jenny Holstein.  After Defendant was removed from the Residence and Holstein had been arrested, officers testified that they continued to hear noise and movement in the kitchen.  This, along with prior photographs of firearms in the Residence, might reasonably have led the officers to believe that they were in danger.  Once the officers entered the kitchen and discovered the noise's source (a small dog), however, any reasonable suspicion of danger disappeared.

The officers therefore exceeded the scope of the protective sweep when they

---

[37] *Id.* at 50–51.
[38] *Maryland v. Buie*, 494 U.S. 325, 335–36 (1990).
[39] *United States v. Colbert*, 76 F.3d 773, 776–78 (6th Cir. 1996); *see United States v. Archibald*, 589 F.3d 289, 298 (6th Cir. 2009) (quoting *Buie*, 494 U.S. at 334) (Officers must have "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.").
[40] *United States v. Holland*, 522 F. App'x 265, 275 (6th Cir. 2013).
[41] *Buie*, 494 U.S. at 335.

- 5 -

Case No. 5:21-cr-00813
GWIN, J.

remained on the premises and continued to search the Residence.  The officers did not testify to hearing voices or movement anywhere beyond the kitchen.  Nevertheless, the officers continued down a long hallway to the master bedroom where they observed a silencer on a bookshelf.  Additional officers were then summonsed inside the Residence to investigate the silencer.

This conduct was unconstitutional.

### B.  Defendant Mullins' Consent Was Tainted and Therefore Invalid.

"[W]here consent follows a prior unlawful act by the government, that consent is tainted, and cannot on its own justify a search."[42]  To overcome this taint, the government must prove an "intervening event of significance between the time of the illegal entry and the time" consent is given.[43]  Put another way, the consent must be "sufficiently attenuated" from the government's illegal act.[44]

In determining whether consent is sufficiently attenuated from an unlawful act, this Circuit examines: (1) the length of time between the unlawful act and the consent; (2) the presence of intervening circumstances; (3) the purpose and flagrancy of the official misconduct; and (4) whether the defendant is properly Mirandized before consenting.[45]

Applying these factors, the Court concludes that Defendant Mullins' consent was not sufficiently attenuated from the officers' unlawful post-arrest search and is therefore invalid.

Less than thirty minutes elapsed between the officers' unlawful search and Defendant Mullins' consent to search.  Such a short period is insufficient to end the

---

[42] *United States v. Damrah*, 322 F. Supp. 2d 892, 899 (N.D. Ohio 2004).
[43] *United States v. Buchanan*, 904 F.2d 349, 356 (6th Cir. 1990).
[44] *United States v. Lopez-Arias*, 344 F.3d 623, 630 (6th Cir. 2003).
[45] *Id.* (citations omitted).

Case No. 5:21-cr-00813
GWIN, J.

influence of the officers' improper conduct.[46]  In addition, this Court finds that no

intervening circumstance broke the causal chain between the officer's unlawful search and

Mullins' consent.  Mullins was handcuffed and in the presence of officers throughout this

interaction though Holstein had been taken into custody and could have been taken off the

premises to answer for the arrest warrant.[47]  Mullins also did not consult with an attorney

before consenting.[48]  Even though Mullins was read his *Miranda* rights, this by itself is

insufficient to purge the taint of the illegal conduct.[49]

 Because the Court concludes that Mullins' consent was not sufficiently attenuated

from the officers' illegal search, evidence seized from the Residence must be suppressed.

### C. Defendant Mullins' Statements Were Tainted and Must be Suppressed.

 Defendant Mullins also moves to suppress statements made to law enforcement.[50]

The Court finds that, in line with the analysis above, the statements constitute evidence

acquired as a result of the officers' unlawful search of the Residence and unjustifiably

prolonged presence on the property.  Other than reading Mullins his *Miranda* rights, no

time or intervening circumstances passed between the officers' illegal activity and Mullins'

statements.  Therefore, Mullins' statements are suppressed as the fruits of illegal conduct.[51]

### III. Conclusion

 For the foregoing reasons, this Court **GRANTS** Defendant's motion to suppress.

---

[46] *See, e.g., United States v. Richardson*, 949 F.2d 851, 859 (6th Cir.1991) ("We do not believe that the taint had dissipated after merely twenty (20) minutes of continued improper conduct."); *Buchanan*, 904 F.2d at 356 (holding an hour to be insufficient to dissipate the taint of illegal police conduct).

[47] *See Buchanan*, 904 F.2d at 356 (deeming the fact that the defendant was handcuffed and in the presence of officers from the time of the illegal act until he gave consent to weigh against there being an intervening circumstance).

[48] *United States v. Wellins*, 654 F.2d 550, 555 (6th Cir. 1981) (opportunity to consult with attorney prior to giving consent was "crucial [intervening] factor" in finding the taint of the illegal entry sufficiently attenuated).

[49] *See Lopez-Arias*, 344 F.3d at 630 (citation omitted).

[50] Doc. 23.

[51] *See, e.g., United States v. Mullins*, No. 3:18-CR-113, 2019 WL 3804660, at *12 (S.D. Ohio Aug. 13, 2019); *United States v. Tate*, No. 1:07-CR-17, 2007 WL 632728, at *9 (N.D. Ohio Feb. 26, 2007).

Case No. 5:21-cr-00813
GWIN, J.

      IT IS SO ORDERED.


Dated: February 3, 2022                        *s/     James S. Gwin*
                                             JAMES S. GWIN
                                             UNITED STATES DISTRICT JUDGE